IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TEROME THOMPSON,

          Plaintiff,       OPINION AND ORDER

  v.

                   14-cv-098-wmc

PAT CHRISTENSON *et al.*,

          Defendants.

    This court gave *pro se* plaintiff Terome Thompson leave to proceed on Eighth
Amendment claims against: (1) several officers at the Eau Claire County Jail, who
allegedly acted with deliberate indifference by ignoring his repeated requests to transfer
out of a cell block where he eventually got into a fistfight with another inmate, and then
by merely observing that fight rather than breaking it up; and (2) defendant Erin Poppe,
a nurse at the Eau Claire County Jail, who allegedly acted with deliberate indifference by
providing inadequate treatment after that fight for his serious medical needs resulting
from that fight. (Dkt. #6.) The court also allowed Thompson to proceed on First
Amendment retaliation claims against some of the same, as well as additional, jail
officials under several different theories. (*Id.*) Now before the court are defendants'
motions for summary judgment on all claims. (Dkt. ##75, 95.) Because the court
agrees that no reasonable jury could find in plaintiff's favor on any of his claims for

reasons explained below, the court will grant defendants' motions for summary judgment.[1]

## UNDISPUTED FACTS[2]

### A. The parties

At the time of the events underlying this lawsuit, plaintiff Terome Thompson was an inmate at the Eau Claire County Jail, having been temporarily transferred there from another correctional institution to attend a matter in state court. Defendants Robert Huffman, Daniel Oates, Joshua Schroeder, Megan Hendrington, Tristan Seidl, Jon Pendergast, Jacqueline Olson, Daniel Noel, Daniel Porn and Jason Higley, against whom plaintiff asserts failure to protect claims, were all correctional officers at the Eau Claire

---

[1] The court will further deny plaintiff's motions to compel discovery responses and stay defendants' motion for summary judgment (dkt. ##110, 111) in light of defendants' uncontested representations that: (1) the additional videos plaintiff requests were overwritten according to the Eau Claire County Jail's video retention policy, and (2) the documents regarding a supposed investigation of defendant Huffman do not exist. Since given the lack of factual and legal complexity presented by this case, and given that Thompson had personal knowledge about the facts material to the arguments raised in defendants' motions, the court will also deny plaintiff's motions for assistance in recruiting *pro bono* counsel (dkt. ##38, 61, 107), as counsel would have been unlikely to have materially aided him in development of the facts here. *See Jackson v. County of McLean*, 953 F.2d 1070, 1072-73 (7th Cir. 1992) (discussing nonexhaustive list of five factors for district courts to consider in deciding whether to grant a motion for assistance in recruiting counsel).

[2] The court finds the following facts material and undisputed, unless noted otherwise. Because plaintiff failed to respond to defendants' proposed findings of fact according to this court's procedures regarding summary judgment motions, despite receiving a copy of those procedures with the preliminary pretrial conference order in this case dated September 9, 2015 (dkt. #36), the court will consider undisputed those proposed facts that defendants support properly, unless opposed by admissible evidence offered or referred to in plaintiff's signed declaration in opposition to defendants' summary judgment motions (dkt. #114). *See Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) ("In considering a motion for summary judgment, the district court is not required to scour the record in search of evidence to defeat the motion[.]"); *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000) ("Given their importance, we have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment.").

County Jail during the period relevant to this lawsuit.  Plaintiff also asserts failure to protect claims against two other officer defendants at Eau Claire County Jail:  Patricia Christenson, a then lieutenant and Phillip Field, a then sergeant.  Plaintiff brings his First Amendment retaliation claim against defendants Field, Huffman, Higley, Seidl and Pendergast, as well as defendant Joe Lorenz, a correctional officer, and Michael Klotz, a sergeant.[3]  Finally, plaintiff brings a claim for deliberate indifference to his serious medical needs against defendant Erin Poppe.

### B. Plaintiff's altercation with another inmate

Thompson was temporarily transferred to Eau Claire County Jail on December 7, 2012, and placed in a holding cell until "booking" was completed on December 9, 2012. When an inmate is booked at the Jail, an officer "classifies" him using certain criteria, including his criminal record, medical needs and history of behavior to help determine, among other things, appropriate housing for that inmate.  After a classification officer completes this task, a booking officer and a pod officer use the classification to determine the cell block in which that inmate should be placed.

As the classification officer who booked Thompson, defendant Pendergast noted on Thompson's classification form that he had a "no-contact" with two other inmates, meaning that they should not be housed in the same cell block.  (Aff. of Jon Pendergast Ex. 9 (dkt. #91-2).)  Consistent with his classification, Thompson was assigned to "H Block," where inmate Torrie Smith, who was not on Thompson's no-contact list, was also

---

[3] Plaintiff originally identified Jason Higley as John Higley, Joe Lorenz as John Lorenz, and Daniel Oates as Robert Oates.

housed.  Before being escorted to H Block, Thompson avers having some conversation in the booking area with jail officials regarding his assigned housing.   Christenson specifically denies speaking with Thompson about *any* specifics about his classification, nor where he would be housed, but claims that they both agreed he would be housed according to his classification and given a "fresh start," which ostensibly referred to the problems during multiple times Thompson had been incarcerated at Eau Claire County Jail in the past.  Officer Higley admits that Thompson asked him where he would be housed at the booking area, but Higley claims that he was sincere in informing Thompson that he did not then know to which block he would ultimately be assigned. On the other hand, Thompson, avers that Higley *did* have knowledge where Thompson would be housed, since he had just given the officer escorting Thompson that information.  (Pl.'s Opp'n Br. (dkt. #112) at ECF 3.)

As Thompson and the officer escorting him approached H Block, Thompson asserts, he noticed that Smith was inside.   (Decl. of Terome A. Thompson (dkt. #114) ¶ 9.)   Thompson avers that he then immediately alerted the officer that "[this assignment] must be a mistake because me and Torrie Smith . . . [aren't supposed] to be housed together[.]"   (*Id.*)   Specifically, Thompson asserts that Lieutenant Pendergast, and two other officers who are not named defendants, had placed a no-contact on Thompson and Smith because of a confrontation between them in August of 2012, when "Torrie Smith threatened to harm [Thompson] because of what he heard from Defendant Huffman."[4]  (*Id.*)

---

[4] With respect to his allegations that he had a no-contact with Smith based on a rumor started by

4

For purposes of summary judgment, the parties also do not dispute that after being housed in H Block, Thompson made multiple requests to be transferred to another cell block because of Smith.  In fact, Thompson avers, and defendants must own for purposes of their motion, that he told "every officer" who made a safety round between December 9 and 11 that his placement was a mistake because "Torrie Smith and I don't get along, could they have the [Sergeant] move me because this housing situation is a fight waiting to happen." (*Id.* at ¶ 10.)

Still, defendant Schroeder, who acknowledges that Thompson asked him for a transfer, also avers that he believed Thompson only wanted to be moved to a different cell block because of a "personality conflict" with Smith.  As a result, when Schroeder informed a sergeant about Thompson's transfer request, he reports telling the sergeant not only that he had not observed any conflicts between Thompson and Smith, but that he often saw the two sitting, laughing and playing cards together.  Schroeder further informed the sergeant that Thompson had a history of getting into conflicts with other inmates and staff, as well as of seeking housing transfers by fabricating conflicts with

---

Huffman, Thompson claims that he informed several defendants about his no-contact with Smith, but there is no admissible evidence supporting his assertion that Pendergast either "removed the no-contact" or "disregard[ed] it vindictively." (Pl.'s Statement of Disputed Facts (dkt. #113) ¶ 12.)  Thompson also fails to provide admissible evidence explaining the basis of his belief that Huffman started a false rumor that Thompson was a high-ranking member of the Gangster Disciples, aside from *Smith* allegedly saying before they fought that Thompson was "on his shit list for false flagging."  (Decl. of Terome A. Thompson (dkt. #114) ¶ 11.)  Finally, Thompson's assertion that defendant Olson ignored another officer who "told [Thompson] in passing later that he alerted staff of [Thompson's] concerns [regarding Smith]" is inadmissible as hearsay, since that officer is not a party defendant.  (Pl.'s Opp'n Br. (dkt. #112) at ECF 3.)  Accordingly, these assertions by plaintiff do not create a genuine dispute of fact.  *See Rockwell Automation, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 544 F.3d 752, 757 (7th Cir. 2008) ("[M]ere speculation or conjecture will not defeat a summary judgment motion.") (quoting *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003)).

other inmates.  Even so, Schroeder avers that he looked at available housing options for Thompson, only to determine there was no other cell block where Thompson could be moved based on his classification and no-contacts with other inmates.

Defendant Hendrington also acknowledges that Thompson relayed his desire to transfer cell blocks to her.  In response, Hendrington told him that:  (1) jail officials were aware of his request; and (2) he could also make a written request through the "kiosk system."  Hendrington avers to having a similar belief that Thompson's transfer request stemmed from a personality conflict with Smith, because Thompson reported Smith was "trying to control the cell block and that this could cause a problem."  (Aff. of Megan Hendrington (dkt. #87) ¶ 7.)

When the sergeant with whom Schroeder spoke advised that Thompson would not be moved to a different cell block at that time, Schroeder relayed that message to Thompson.  After that, Thompson made the following written transfer request, using the kiosk system on December 9, 2012.

> Can [I] please request to be moved away from Torrie Smith before there's a problem?  I don't allow people to try to bully me [or] run the block with loud mouth b.s.  That is a fight waiting to happen.  I got trial in three days and [I'm u]nder a lot of stress.

(Aff. of Joel Brettingen Ex. 12 (dkt. #92-3).)

Sergeant Field was informed about Thompson's kiosk message by a correctional officer not named as a defendant.  At that time, the officer also told Field that he had observed Thompson and Smith interacting with no apparent conflict.  Other officers gave Field the same message.  Though unaware of Thompson's kiosk message, Lieutenant

Christenson was similarly informed that Thompson wanted a transfer, along with the officers' beliefs that the request was based merely on a clash of personalities, and their observations that Thompson and Smith had so far gotten along without incident. Officers Huffman, Hendrington, Noel and Seidl all aver to similar observations regarding Thompson and Smith's relationship.

Regardless, Thompson and Smith got into a physical altercation in H Block on December 11, 2012. Once he heard what sounded like a fight, Officer Noel went to H Block. He then called over the radio for backup and for the control pod to order a lockdown. Consistent with standard procedure at the Eau Claire County Jail, Noel waited outside H Block until inmates not involved in the fight had returned to their cells and other officers, including officers Porn, Oates and Huffman, had arrived to provide assistance. Once they physically entered H Block, there is no dispute that these officers separated Thompson and Smith immediately, although Thompson claims that the officers, rather than intervening to stop the fight, purposefully delayed entering H Block and laughed while watching the fight.

### C. Thompson's medical treatment

After Thompson and Smith were separated, defendant Oates assessed Thompson's injuries before he was taken to a different cell block. Defendant Poppe then examined both Smith and Thompson for possible injuries as the nurse on duty. In Thompson's medical progress notes, Poppe notes that Thompson reported being "pushed over the rails behind the stairs [and] . . . struck in the face." (Decl. of Ryan Wiesner Ex. A (dkt. #100-1).) She also recorded the following:

7

> [Patient (Thompson)] has an approx. 2cm cut on his bottom R side lip [and] small 1cm x 1cm blood blister on the tip of his tongue[;] his upper R side of mouth [and] gums are cut [and] bleeding[;] he has complaints of backache, his lower back, where he states he was pushed over the bars[;] his R hand thumb side is red [and] slightly swollen[;] he states it hurts [and] feels [jammed;] he has full ROM in hand [and] fingers[.]

(*Id.*)  According to Poppe, she asked Thompson whether he believed he was missing any teeth or broke any bones, but he did not respond.

Thompson presents a much different version of Poppe's bedside manner.  He claims that she was dismissive, smirking throughout her examination and stating that he was "not that hurt" and would "be OK," despite his complaints of serious pain.[5]  (Decl. of Terome A. Thompson (dkt. #114) ¶ 13.)  Specifically, Thompson asserts that he complained, "my head was throbbing, something feels broke in my back and my front teeth feel as if [they're] loose," to which Poppe responded that Thompson would not be able to talk if his teeth were loose and that he "only felt that way because [his] adrenaline was pumping from the fight."  (*Id.* at ¶ 14.)

There is no dispute, however, that Poppe provided Thompson with Tylenol, an ice pack and gauze to stop the bleeding in his mouth, although he refused the Tylenol.  Poppe also states that she instructed Thompson to follow up if he needed any additional care, making the following contemporaneous note with regard to treatment:

> Rinse mouth out repeatedly [with] salt water, place icepack on face [and] lower back for pain [and] inflammation.  Follow

---

[5] Thompson alleges that Poppe's behavior was consistent with how she had treated him in the past, claiming that previously she "made several complaints about [his] personality and her personal dislike for [him] while passing out [his] meds at times, refusing to give [him] meds at times, depending on how she felt at that moment."  (Pl.'s Opp'n Br. (dkt. #112) at ECF 6.)

up as needed if symptoms worsen.  Pt has been educated on instruction [and] agrees.

(*Id.*)

Thompson did not file a medical request for additional treatment or grievance following Poppe's treatment, either in written form or electronically using the kiosk system, before his temporary incarceration at the Eau Claire County Jail ended on December 14, 2012.  Thompson explains, however, that "the kiosk wasn't honoring [his] password between 12-11-12 and 12-14-12, so [he] couldn't use it to summon nursing staff for [his] pain."  (Pl.'s Opp'n Br. (dkt. #112) at ECF 6.)  Also, while Thompson admits that the cut on his lip healed by itself, without stiches, he claims that he later "got evaluated for [his] injuries" shortly after being transferred out of the Eau Claire County Jail.  (Decl. of Terome A. Thompson (dkt. #114) ¶ 18.)  It also appears that any subsequent treatment was not very extensive, although he did get his back x-rayed and still receives general pain meds for headaches and back aches.  (Dep. of Terome A. Thompson (dkt. #130) at 105-08.)  He was also told that his teeth would no longer be loose after his gums healed.  (*Id.*)

### D. Alleged retaliatory acts

As for retaliatory acts, Thompson first claims that defendants Klotz and Field intentionally placed him in a cell block with violent, racist inmates in retaliation for filing grievances.  Both defendants assert that they never retaliated against Thompson, nor did they intentionally place him in a cell block with racists for the purpose of causing him harm.

Next, Thompson claims that defendants Lorenz, Higley, Huffman, Seidl, Klotz and Field retaliated against him for filing grievances by repeatedly intercepting those concerning racially-biased remarks or decisions. Those defendants deny ever diverting Thompson's grievances from the proper channels, although multiple defendants recall that Thompson often complained about racially-biased treatment by jail staff. As for specific, formal grievances regarding racism, Officer Lorenz recalls one in which he found Thompson's complaint of discriminatory treatment was unfounded after conducting an investigation.[6]

Finally, Thompson claims that defendant Pendergast retaliated against him by providing a falsified, exaggerated report of his fight with Smith to a classification officer at Columbia Correctional Institution, who called Pendergast in 2013 to ask about Thompson's disciplinary history at the Eau Claire County Jail. In response, Officer Pendergast admits telling the classification officer that Thompson: (1) may get charged with battery for his December 2012 fight with Smith; (2) had a history of fighting and disruptive behavior, for which he received a conduct report in September of 2012; and (3) had served 49 days in disciplinary segregation since April of 2012 for various behavior. Still, Pendergast denies reporting an embellished version of the fight.

OPINION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, the court construes

---

[6] Officer Huffman also denies Thompson's claim that he filed a falsified disciplinary report.

all facts and draws all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).  But a party opposing a motion for summary judgment must "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Moreover, as the party with the burden of proof, plaintiff cannot simply rest on the allegations in his complaint, *Sparing v. Village of Olympia Fields*, 266 F.3d 684, 692 (7th Cir. 2001), or on his subjective beliefs, *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007).  Rather, he must product "*evidence* . . . such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248 (emphasis added); *see also Knight v. Wiseman*, 590 F.3d 458, 463-64 (7th Cir. 2009) ("[T]he evidence submitted in support of the nonmovant's position must be sufficiently strong that a jury could reasonably find for the nonmovant.").  Since defendants move for summary judgment on each of plaintiff's claims, the court addresses each in turn below.

## I.  DELIBERATE INDIFFERENCE

### A.  Substantial Risk of Serious Harm

Thompson's failure to protect claim requires him to show two elements: first, that "there was a substantial risk beforehand that the serious harm might actually occur," and second, that an individual defendant both knew of and disregarded that risk. *See Brown v. Budz*, 398 F.3d 904, 910-13 (7th Cir. 2005) (citing *Farmer v. Brennan*, 511 U.S. 825, 834, 838 (1994).)  While the standard by which a plaintiff must show that he was at substantial risk of harm is high under the first prong, "it is not insurmountable." *Id.* at 911.  A substantial risk of attack requires proof of a "strong likelihood rather than a mere

11

possibility." *Pinkstson v. Madry*, 440 F.3d 879, 889 (7th Cir. 2006) (internal quotation marks and citations omitted).  For example, a plaintiff can point to "risks attributable to detainees with known 'propensities' of violence toward a particular individual or class of individuals; to 'highly probable' attacks; and to particular detainees who pose a 'heightened risk of assault to the plaintiff.'"  *Brown*, 398 F.3d at 911 (quoting *Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000)).

Defendants argue that even taking all of Thompson's proof on its face, no reasonable trier of fact could find a substantial risk of harm because *he* instigated the fight.   At this stage, however, the court must draw all reasonable inferences in Thompson's favor, permitting the possibility that his actions were merely in response to a high risk of assault from Smith.  Defendants' motion for summary judgment on the basis that they were not aware of any substantial risk to Thompson, however, carries more weight.

To be deliberately indifferent to a substantial risk of assault faced by an inmate, a correctional officer must have "actual notice of a *specific* risk of serious harm[.]"  *Butera v. Cottey*, 285 F.3d 601, 606 (7th Cir. 2002) (emphasis in original).  Even construing the facts in Thompson's favor, no reasonable jury could find that any defendant was aware of a *specific* risk of assault.  With respect to the officers responsible for classifying, booking and housing Thompson, there is no evidence that these defendants were aware of a no-contact order with respect to Smith, nor of a specific threat or instance of violence by Smith toward Thompson.  Moreover, even if the court accepted Thompson's assertion that the defendants did not truthfully respond to his questions about where he was going

12

to be housed, even Thompson does not assert that he notified them of a specific threat or act of violence towards him.   At most, these defendants were aware of Thompson's assertion of general tension between Smith and him, which is not enough to find the decision to put them in the same cell block amounts to deliberate indifference.   *See Klebanowski v. Sheahan*, 540 F.3d 633, 639-40 (7th Cir. 2008) (finding that the plaintiff did not provide sufficient notice of a specific threat of harm when the officers knew he had been in an altercation with the same three inmates earlier and wanted a transfer out of fear for his life but did not tell them that he was attacked because he was not in a gang or that "he had actually been threatened with future violence").

The same goes for the defendants who Thompson claims he notified as they did their rounds.   Again, Thompson only alerted them that he and Smith did not "get along" and that leaving the two in the same cell block was "a fight waiting to happen." Similarly, Thompson's kiosk message regarding Smith stated merely that he wanted to be transferred "before there's a problem" and that he wouldn't allow anyone to "bully [him or] run the block with loud mouth b.s."   These complaints fall far short of qualifying as specific threats about which officers must be aware before they can be held constitutionally liable.   *See Klebanowski* 540 F.3d at 639-40; *Butera*, 285 F.3d at 606-07 ("Butera's statements to the correctional officers that he 'was having problems in the block' and 'needed to be removed' were insufficient to give the Sheriff notice of a specific threat.").[7]

---

[7]   Even with respect to plaintiff's uncorroborated claim that Officer Pendergast had placed a no contact on Thompson and Smith during a previous stay at Eau Claire County Jail in August of 2012 due to a "threat" of harm, there is no specific basis to find Pendergast should have viewed

Moreover, even if plaintiff's description of risk were enough to move the needle with respect to some defendants, they took reasonable measures after receiving his written transfer request, since there is no dispute that defendants observed Thompson and Smith interacting without incident (or received reports to that effect), reviewed Thompson's behavioral history (or were apprised of it), and inquired as to the availability of other cell blocks to which he could be moved consistent with his classification. Therefore, a reasonable trier of fact could not find them liable for refusing to investigate further or take heightened action in response to Thompson's general complaints. *See Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008) (finding that defendants' failure to seek more detail about plaintiff's allegations of fear did not constitute deliberate indifference); *Fisher v. Lovejoy*, 414 F.3d 659, 662 (7th Cir. 2005) ("The test of deliberate indifference ensures that the mere failure of the prison official to choose the best course of action does not amount to a constitutional violation."). Having identified no evidence of a specific threat against Thompson or actual confrontation between the two that defendants ignored in determining, based on their observations, that Thompson faced no specific risk of harm requiring transfer, Thompson cannot establish the subjective prong of his deliberate indifference claims based on defendants' failure to transfer him from H Block. *See Riccardo v. Rausch*, 375 F.3d 521, 528 (7th Cir. 2004) ("[A] prisoner's bare assertion is not enough to make the guard subjectively aware of a risk, if the objective

---

the threat as a substantial risk some four months later when Thompson returned, especially when officers were reporting that he seemed to be getting along with Smith, and no actual violence had even occurred between the two. *See* discussion above.

indicators do not substantiate the inmate's assertion."). As the Seventh Circuit has oft explained, proof of negligence is insufficient:

> the plaintiff must show that the official acted with the requisite culpable state of mind. This inquiry has two components. The official must have subjective knowledge of the risk to the inmate's health, and the official must also disregard that risk. Evidence that the official acted negligently is insufficient to prove deliberate indifference. Rather, deliberate indifference is simply a synonym for intentional or reckless conduct, and that reckless describes conduct so dangerous that the deliberate nature of the defendant's actions can be inferred. Simply put, an official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Even if a defendant recognizes the substantial risk, he is free from liability if he reasonably responded to the risk, even if the harm ultimately was not averted.

*Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (internal quotation marks and citations omitted).

Thompson also fails to present any evidence by which a reasonable jury could find that defendants acted with deliberate indifference for failing to break up his fight with Smith sooner. In fact, the evidence is quite to the contrary. While defendants admit that they did not immediately enter H Block when Thompson and Smith began fighting, Thompson does not dispute that their actions were consistent with Eau Claire County Jail policy. Pursuant to that policy, which is designed to protect both officers and inmates, correctional officers are trained to enter a cell block to break up a fight between inmates only after other inmates have returned to their cells under a lockdown order and a sufficient number of officers have arrived to safely extricate those fighting. (Defs.' PFOF (dkt. #77) ¶ 64.) While this policy does create the potential for additional harm

15

to an individual inmate, there is no reason to think that an insufficient number of officers entering into the fray will make any appreciable difference even as to the combatants, and every reason to think that the officers will be subjected to an unreasonable risk.   Regardless, the Constitution requires no more.   *See Guzman v. Sheahan*, 495 F.3d 852, 858 (7th Cir. 2007).

Finally, while Thompson generally asserts that defendants delayed entering H Block to break up the fight, he does not dispute defendants' account that they entered H Block once backup had arrived and most inmates had returned to their cells, a delay of two minutes during which Thompson and Smith made little physical contact.   (Defs.' PFOF (dkt. #77) ¶ 183.)   Since correctional officers are not required to break up fights when doing so would place them in significant harm, *Guzman*, 495 F.3d at 858, there is no basis to find that defendants acted with deliberate indifference in delaying their entry into H Block to break up the fight between Thompson and Smith.   Accordingly, the court will grant summary judgment to defendants on Thompson's failure to protect claims.

### B.  Serious Medical Needs

To survive summary judgment on his claim of deliberate indifference to a serious medical need, Thompson must proffer sufficient evidence from which a reasonable jury could find both that: (1) he had an objectively serious medical need; and (2) defendant was deliberately indifferent to it.   *Grieveson*, 538 F.3d at 779.   Thompson principally contends that his complaints to Poppe of serious injury to his back and mouth went unheeded, while the undisputed evidence shows that Poppe promptly provided gauze, an

16

ice pack and Tylenol as treatment for Thompson's injuries.  Of course, Nurse Poppe cannot escape liability simply because she provided some treatment if that treatment was "blatantly inappropriate." *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005).  To prove this, Thompson must establish his injuries were serious at the time Poppe treated him or posed an unreasonable risk to his future health, *Board v. Farnham*, 394 F.3d 469, 479 (7th Cir. 2005), such that "no minimally competent professional would have . . . responded [similarly] under those circumstances." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008)).  Put differently, Thompson must meet the "high" burden to show that "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* (quoting *Sain*, 512 F.3d at 894-95).

On this record, no reasonable jury could find that Thompson's medical needs were serious or that Poppe's response to Thompson's injuries amounted to deliberate indifference under this standard.  Though Thompson alleges that Poppe was already predisposed to dislike him at the time she examined him, and that she was smirking while she examined him, he does *not* dispute that Poppe asked whether he was missing any teeth or had any broken bones; *nor* that she provided him gauze to stop his gums from bleeding, and she gave him Tylenol and an ice pack for his pain, with instructions to follow-up as necessary if his pain worsened.  Moreover, while Thompson claims that the Jail's electronic kiosk to alert Poppe between December 11 and 14 was not working, he does not dispute that he could have requested follow up medical treatment in writing,

rather than using the kiosk system.   Indeed, even if Thompson had claimed that he informed jail staff that he needed additional treatment, he has shown nothing to attribute that failure to respond to *Poppe*.  Finally, Thompson's lack of follow-up strongly suggests his medical need was not serious in the first place.

Under the circumstances, no reasonable jury could find that no other minimally competent medical professional would not choose a course of treatment similar to what Poppe chose, however conservative, or even negligent it might arguably have been. Poppe only saw Thompson once, directly after he had gotten into a fight.   While Thompson complained of injuries to his mouth and back, caused by being shoved over a rail during the fight, Poppe's decision to prescribe, at least initially, minimal measures to alleviate pain experienced does not demonstrate the requisite culpability to ignore potentially serious long-term ailments that would have been obvious to a lay person.  *See Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014) (finding that medical doctor's treatment decision was not "blatantly inappropriate" because "there was no prior indication of a potentially serious long-term medical issue, nor was the need for a specialist obvious").

On the contrary, Poppe's contemporaneous treatment notes reflect her observing cuts and bleeding in Thompson's mouth, listening to his complaints of backache and a swollen hand, and giving him instructions on how to rinse his mouth with salt water and use ice packs and Tylenol to address lower back pain and inflammation, as well as follow up "if symptoms worsen."   And again, the fact that Thompson never followed-up suggests that Poppe's conservative approach was the right one.   At minimum, it makes

18

unreasonable any inference that Poppe "refused to verify underlying facts that [she] strongly suspected to be true, or declined to confirm inferences that [she] strongly suspected to exist[.]" *Farmer,* 511 U.S. at 843 n.8; *contrast Conley v. Birch,* 796 F.3d 742, 747 (7th Cir. 2015) (holding a reasonable jury could find deliberate indifference where the treating doctor may have concluded that the plaintiff's hand was "probably fractured" when the treatment notes suggested severe injury, including severe swelling two days later, lost function, discoloration and notation of a "possible/probable fracture").

At bottom, Thompson's principal complaint is that "Poppe never scheduled a follow-up, like every other nurse in America would schedule" (Decl. of Terome A. Thompson (dkt. #114) ¶ 19), but Thompson's "mere disagreement" as to the best course of treatment cannot establish a constitutional violation.  *Greeno,* 414 F.3d at 653 (citing *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996)).  The Eighth Amendment does not entitle a plaintiff to the best level of medical care; indeed, "[t]he cost of treatment alternatives is a factor in determining what constitutes adequate, minimum-level medical care[.]" *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) (quoting *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999)).  Of course, "medical personnel cannot simply resort to an easier course of treatment that they know is ineffective[.]" *Id.* (quoting *Kelley v. McGinnis*, 899 F.2d 612, 616 (7th Cir. 1990)).  Based on the undisputed record here, however, no reasonable jury could conclude that Poppe made the treatment decisions she did with deliberate indifference to serious risks to Thompson's health.  Accordingly, the court will grant summary judgment to Poppe.

## II.    RETALIATION

To prevail on a retaliation claim, Thompson must prove that: (1) he was engaging in activity protected by the First Amendment; (2) the defendant's conduct would deter a person of "ordinary firmness" from engaging in this protected activity in the future; and (3) the protected activity was at least a motivating factor in the defendant's decision to take the retaliatory action.  *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009).  To survive summary judgment with respect to his First Amendment retaliation claims, then, Thompson must present evidence indicating that his protected activity was a sufficient condition of defendants' allegedly retaliatory actions.  *Greene v. Doruff*, 660 F.3d 975, 978 (7th Cir. 2011).

Here, even assuming that Thompson engaged in protected activity under the First Amendment by filing grievances, he has wholly failed to provide evidence from which a reasonable jury could infer a causal connection between his grievances and the allegedly retaliatory acts.  First, Thompson fails to identify a specific grievance or grievances that he claims prompted the alleged retaliation against him, meaning that he cannot even provide threshold evidence as to coinciding timing.  *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000).  Second, Thompson does not respond to defendants' proffer of seemingly good faith explanations for taking actions against Thompson, including Pendergast's report to the classifying officer at Columbia Correctional Institution (Aff. of Amy J. Doyle Ex. 15 (dkt. #93-1) at ECF 3), and Higley's allegations that led to a conduct report (Aff. of Jason Higley Ex. 6 (dkt. #90-3)), essentially leaving unchallenged their assertions that they lacked any retaliatory motive.  Third and finally,

lacking *any* evidence linking his protected activity to an allegedly retaliatory action taken by one or more of these defendants, Thompson's mere "hunch" about defendants' animus towards him does not alone save his retaliation claims from summary judgment. *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008); *cf. Lehn v. Bryant*, No. 04-CV-3100, 2007 WL 1099531, at *3 (C.D. Ill. Apr. 10, 2007) (granting summary judgment to defendant on plaintiff's retaliation claim when there was "no reasonable inference that [defendant's] actions were motivated by retaliation," even though they were "unfair and unnecessary").  Thompson's retaliation claims, therefore, will also be dismissed.

ORDER

IT IS ORDERED that:

1) Defendants' motions for summary judgment (dkt. ##75, 95) are GRANTED;

2) Plaintiff's remaining motions (dkt. ##38, 61, 107, 110, 111) are DENIED;

3) Defendants' motions to hold trial in Eau Claire, Wisconsin (dkt. #139) and to continue (dkt. #161) are DENIED as moot; and

4) The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 12th day of October, 2016.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge